352 So.2d 293 (1977)
NORTH LOUISIANA MILK PRODUCERS ASSOC., INC., Plaintiff-Appellee,
v.
The SOUTHLAND CORPORATION, Defendant-Appellant.
No. 13376.
Court of Appeal of Louisiana, Second Circuit.
October 31, 1977.
*294 Booth, Lockard, Jack, Pleasant & Lesage by Joe C. LeSage, Jr., Shreveport, for defendant-appellant.
Robert G. Pugh, Shreveport, for plaintiff-appellee.
Before HALL, MARVIN and JONES, JJ.
MARVIN, Judge.
This controversy concerns whether or not an agreement existed for the price of bulk milk delivered by the plaintiff producer to the defendant processor. Specifically, we are concerned with whether or not an offer was made, by whom, when and for what duration, and with whether or not an offer was accepted.
Judgment below was against the defendant for the price claimed by the plaintiff producer. Defendant contends on appeal that since there was no agreement or contract as to the price, the lower court erred in supplying the price. We find there was a contract and affirm the judgment.
For several years, plaintiff supplied bulk milk to defendant's processing plant (Midwest Dairy) in Shreveport. A state agency and a federal agency periodically (usually monthly) set minimum prices for bulk milk. Processors ordered milk from plaintiff weekly and sometimes daily. Plaintiff billed, and the processor paid, the higher of the minimum prices.
When the pricing of milk by the government agencies, even though as minimum prices, came under attack in the courts and in the legislature in 1976, the agencies set the minimum prices at an amount plaintiff's membership thought too low. In August, 1976, plaintiff's executive board or membership began to meet monthly and set its own price. The processors were notified of the price each month by letter. With little change in language from August, 1976, through April, 1977, plaintiff and defendant corresponded monthly, essentially in this language:
FROM PLAINTIFF TO DEFENDANT:
"Effective for the month of_____, all milk purchased by your plant will be priced at $_____
* * * * * *
"Your acceptance of milk from members of this association during (the month named) will constitute your agreement to these announced prices."
PLAINTIFF'S LETTER, SEPT. 7, 1976:
"* * * In regard to our recent conversations and correspondence concerning the pricing of milk purchased by your company from members of this association, I call your attention to pages 29 and 30 . . . of production stabilization *295 plan, production marketing area # 1 Greater Louisiana area. This plainly states that the prices established by the state are minimum prices.
"By continuing to accept milk from members of this association in August and September you have agreed to the prices announced in our letters of August 12, 1976 and August 27, 1976."
DEFENDANT'S REPLIES:
August 13, 1976
"I do not agree with your decision . . to set the price of raw milk for the . . . Shreveport area . . . As I see it now, the Commissioner's set price would be the only price we could pay . . ."
September 2, 1976
". . . I still contend we will pay the price that was announced by the Commissioner. . . we will continue to pay the price that he has set for our area."
February 28, 1977
". . . for March . . . we will continue to pay the Federal Order price. . .
"We will pay the price announced by the Market Administrator each month. Accept this letter as a protest that we do not agree and will not pay . . . above the Federal Order price."
PLAINTIFF'S REPLY, MARCH 2, 1977:
". . . we do not accept your counter offer for milk . . . as stated in your letter of February 28, 1977.
* * * * * *
"All milk received by your plant from members of this association in March 1977 . . . will be on the terms as set out in my letter to you dated February 25, 1977."
Defendant again responded that it would pay only the federal order price. Similarly, each manager of the respective litigants testified that he always had the last word in verbal communications with the other manager, "our price is" vs. "we won't pay it."
Several times each week, and even after this monthly correspondence began, another of defendant's supervisory employees (not the manager) would telephone plaintiff's shipping foreman, as was customary, and would order specific quantities of raw milk to be delivered almost daily. These employees, however, never discussed price. No milk was delivered except on defendant's order. Defendant's manager testified that defendant could have obtained, apparently with some difficulty, raw milk from a source out of state about 70 miles distant.
Plaintiff billed defendant at plaintiff's declared prices. Defendant paid on its calculation of the government prices, but without conditioning its payment or otherwise attempting to effect accord and satisfaction. See Williams v. The Hanover Insurance Co. of New York, 351 So.2d 858 (La. App. 2d Cir. 1977). Suit was brought in December, 1976, for the difference in price, which at the time judgment was signed was $79,958. The existence or absence of an agreement as to price, and not payment is the issue.
During the years plaintiff and defendant did business togetherwith plaintiff as the sole supplier of milk for defendantthe quantity of milk periodically ordered by defendant did not greatly vary. The time and method of ordering and delivering of milk and billing and paying were established by custom. C.C. Art. 3. Price was not often discussed by the litigants because the price to be paid for milk was customarily established and understood.

OFFER AND ACCEPTANCE?
"No particular form is required for the offer or the acceptance. Either of them, the offer, as well as the acceptance of a contract, may be express, implied or tacit. . . However, as an offer is an indispensable element of that concurrence of the wills of which the contract consists, it is of utmost importance to determine whether a certain declaration of will amounts to a real offer or is merely a declaration made without an intention of becoming bound, such as a simple proposition, or a simple pollicitation . . ."
*296 "An offer is a proposal to do something or to refrain from doing something in return for a counter-promise, an act, or forbearance. To be considered properly as such, the offer must fulfill the following three requirements clearly established in the Louisiana Civil Code:
"(a) The design to give the other party the right of concluding the contract by his assent.
"(b) The offeror's intention to obligate himself.
"(c) A serious intent.
"When requirement (a) is absent, the proposition cannot be considered an offer, but rather an invitation to negotiate, or an expression of willingness to receive an offer from the other party. The intention required under (b) must be that of creating a legal obligationand not one in the moral sense or a duty in conscience. Requirement (c) will exclude, as a real offer, a proposition made in jest, as a part of a game, or at the peak of an argument. . .
"Thus, in matters of everyday practices and dealings, it has been decided that a quotation of prices is not an offer to sell in the sense that a completed contract will arise out of the mere acceptance of the rate offered, or out of the giving of an order for merchandise in accordance with the proposed terms. But when a merchant, on request, sends a price list to a customer who orders goods in accordance with the price list, there is a contract formed between them for the price and upon conditions mentioned in the price list. The surrounding circumstances explain sufficiently the difference between the two situations: with merchants, the sending of a price list implies the intention to contract on its terms, while with persons who are not merchants, a quotation of a price implies no such intention.
"It has also been decided that an advertisement published in a newspaper may constitute an offer, the acceptance of which creates an obligation to perform in accordance with the terms of the offer." 1 S. Litvinoff, Obligations, § 130 in 6 Louisiana Civil Law Treatise 211-213 (1969). (Footnotes omitted).
"An offer or proposal may be so worded that the offeree gets no power to accept by the words, written or spoken, `I accept your offer,' Where one party wrote to another offering to supply specified goods at certain prices for the period of twelve months in such quantities as the latter might order from time to time,a reply by the offeree saying `I accept your offer as made' did not make a contract. This is not for lack of mutual expressions of assent, but because the form of the offer is such as to make the offeree's expression insufficient as a consideration. By using the quoted words the offeree has made no promise to buy any quantity and has given no other consideration. Yet the proposal by the first party was an operative offer and remains so for a year unless sooner revoked. The offeree can effectively accept at any time within the year by ordering some specific quantity, thereby consummating a bilateral contract to sell and to pay for that quantity." 1 A. Corbin, Corbin on Contracts, § 65 (2d Ed. 1963), p. 270.
Before August, 1976, the dealings between the litigants could be viewed in two ways. Either the defendant, when placing the periodical order for a specific quantity of milk, was offering to buy at the government price as was customarily understood and practiced, or the plaintiff, by initially announcing to defendant that it had milk to sell at the government price, was offering to sell. An offer to buy a specific quantity of milk at a specific unit price would have been accepted by shipment. An offer to sell at a specific price would have been accepted by ordering a specific quantity of milk. The record does not enable us, and it is not necessary for us, to make such a determination. In any event, it would have been the specific order of the defendant upon which both parties intended to be bound.
After August, 1976, plaintiff clearly and expressly informed defendant that it would *297 no longer abide with the custom which had existed between them and that it was offering to sell to defendant its milk at its stated price. Under these circumstances, we conclude that it made a standing or operative offer to sell for the stated period as was expressed in the monthly correspondence as well as in some telephone calls between the managers. As discussed in Corbin, supra, § 65, the contemplated acceptance of this offer was a specific order by defendant and not a promise by defendant that it would order in the future. Plaintiff's offer remained in effect for the stated monthly period. That offer was not affected or revoked by defendant's grumbling about price and it would not have been revoked even by an offer (or counter offer) from the defendant. See Corbin, supra, § 84, § 92, Litvinoff, supra, § 140, La.C.C. Arts. 1801, 1804, 1809.
On the other hand, and after August, 1976, defendant merely sought to get plaintiff to agree to continue to sell milk at the government price ("we will pay only. . . etc."), which plaintiff would not do. Thus, we consider the offer which was made an offer to sell rather than an offer to buy. Defendant could have made, but did not make, an operable offer to buy (an order of a specific quantity at a specific price, "Please ship us X quantity of milk this date at the government price").
"In order to deserve the name `counter offer,' it must be so expressed as to be legally operative as an offer to the party making the prior proposal. It is not a counter offer unless itself is an offer, fully complying with all the requirements that have been previously discussed." Corbin, supra, § 89, p. 379.
"In order to be legally operable and to create a power of acceptance, it is necessary that the offer shall contain all of the terms of the contract itself. It is not enough for one party to say what he will do; he must also say what he will do it for, that is, what the other party must do in exchange." Corbin, supra, § 11, p. 26.
We hold that plaintiff made an operative offer to sell to defendant at stated prices for a stated period of time, the acceptance of which was contemplated to be an order made by defendant for a specific quantity of milk. We hold that defendant's correspondence did not constitute an operable offer to buy from plaintiff because the correspondence did not order a specific quantity of milk at a specific price. We further hold that when the defendant's employee verbally placed a periodical order for a specific quantity of milk, and without conditioning the order as to price, each periodical order constituted an acceptance of plaintiff's standing offer to sell at its stated price which was in effect at the time rather than constituting an offer by defendant to buy the specific quantity of milk at a specific price.
A case with similar facts involving bulk milk prices, reaching the same result under common law principles, is Akron Milk Producers, Inc. v. Isaly Dairy Co., 109 Ohio App. 155, 164 N.E.2d 579 (1959).
At appellant's cost, judgment is
AFFIRMED.