379 So.2d 856 (1980)
Russell L. CUOCO
v.
PIK-A-PAK GROCERY CORPORATION.
No. 10677.
Court of Appeal of Louisiana, Fourth Circuit.
January 10, 1980.
*857 Milling, Benson, Woodward, Hillyer, Pierson, & Miller, James K. Irvin, Kennedy J. Gilly, Jr., New Orleans, for defendant-appellant.
Glenn C. McGovern, New Orleans, for plaintiff-appellee.
Before GARRISON, CHEHARDY and STOULIG, JJ.
GARRISON, Judge.
This case involves an action to evict a sub-lessee, Pik-a-Pak Grocery Corporation d/b/a Li'l General Stores, on the grounds of an alleged breach of a written contract of lease and two validly executed options. The trial court granted judgment evicting the sublessee, without ruling that a breach had occurred. Additionally, the trial court found that the sublease had not been executed by the parties to the action to evict, but rather had been executed between the sublessor-party, Russell Cuoco, and a nonparty, General Host Corporation, the parent corporation of Pik-a-Pak Grocery Corporation. This ruling was based on the trial court's findings that the options were void, that a new contract of lease had been confected and thatin the absence of a written lease between Pik-a-Pak and General Host which stipulated a durationPik-a-Pak Grocery Corporation possessed the premises on a month-to-month basis at the sufferance of General Host. Finally, the trial court held that Li'l General Stores was not a legal entity, Pik-a-Pak Grocery Corporation appealed the judgment of the trial court. We reverse.
We find that the trial court erred in failing to find that the options to lease had been validly executed. Both appellee and appellant state that a stipulation relative to the valid exercise of the two options had been entered into prior to trial. The parties agreed to the stipulation during a pre-trial hearing. However, the court reporter lost the transcript containing that stipulation. We believe that the loss of the pretrial stipulation is of no moment, as both parties stipulated at trial that the terms of lease were validly extended by both options and that Pik-a-Pak was the sublessee of Cuoco.[1] *858 Indeed plaintiff sued for eviction seeking a cancellation of the sublease and pleading the existence of the sublease.
Inasmuch the district court did not reject this stipulation it was bound by the admission. Indeed, counsel for plaintiff failed to object to its inclusion into evidence at trial. It is only on appeal that plaintiff commences an argument that the options were void.
An examination of the relevant correspondence further bolsters our conclusion that the parties contemplated execution of the options as opposed to confection of a new lease. The correspondence which extended the first option uses the language "with respect to that certain lease dated April 16, 1962 covering the captioned premises. The lease will be extended for a further term ..."[2] The correspondence which extended the second option uses the language "we do hereby agree to renew and extend that certain lease ..."[3] Indeed, there is little doubt that the agreement of the parties was an exercise of the option as opposed to confection of a new lease.
The trial court concluded that the options had not been executed as a result of two findings: First, the court found that the options were void because they failed to specify a future rental price. Second, the court found that "Li'l General Stores" was not a legal entity, hence it had no capacity to contract. We will address the former finding first.
The word "option" is a common law term which is used by civilians for the sake of brevity and expediency in describing a similar civilian concept. The proper civilian concept is a "unilateral promise to contract." The trial court's ruling on the question of rental price resulted from an erroneous juxtaposition of these two similar, but not identical, concepts:
"Similarity, however, is not the same as identity. In order to meet the requirements for the formation of a contract, a promise requires consideration at common law. At civil law, instead, the question is not whether a promise is supported by consideration, but whether an obligation has a cause and, from this viewpoint, a party's will to be bound is an effective cause.
"In both systems, however, an option is an onerous contract. At common law, this is so for the reason that consideration eliminates the otherwise gratuitous nature of the promise. At civil law, it is so because the promisor's interest in making the contemplated final contract suffices to give his obligation an onerous cause. The difference lies in the fact that, at common law, the element of onerousness, the consideration, is given to the promisor by the promisee, while, at civil law, the element of onerousness resides in the promisor's own will in the form of a motive.
"Finally, options are unilateral contracts under both systems of law. Here again, however, the reasons that make the contract unilateral differ. A unilateral promise to contract is a unilateral contract at civil law because it gives rise to only one obligationthe promisor's. An option contract is unilateral at common law because only the performance of one party is owed; the other has already performed when he gave consideration." 2 Litvinoff, Obligations § 105 (7 La.Civil Law Treatise, 1969).
The trial court appeared to believe that failure to stipulate the rental price was a lack of consideration, hence the option was *859 void. In Louisiana, however, causation, not consideration, is controlling. Even assuming arguendo that the options were fatally defective, the subsequent actions of the parties ratified the options as they were exercised.
We agree with the trial court that "Li'l General Stores" is not a legal person, but this finding is not evidence of a lack of capacity to contract. Additionally, we base this finding on reasons other than those enunciated by the trial court which held that "Li'l General Stores" was an operating division of General Host Corporation.
The sublessee was cited and appears as "Pik-a-Pak Grocery Corporation d/b/a Li'l General Stores." The appellation "Li'l General Stores" is the trade name of Pik-a-Pak Grocery Corporation as allowed by R.S. 51:211 as follows:
"D. The term `trade name' means a word, name, symbol, device or any combination thereof used by a person to identify his business, vocation or occupation and distinguishes it from the business, vocation or occupation of others.
"E. The term `person' as used herein means any ... corporation ..."
We hold that "Li'l General Stores" is the trade name of Pik-a-Pak Grocery Corporation, a legal entity having capacity to contract.
Having concluded that the two options were validly executed, thus extending the sublease between Russell Cuoco and Pik-a-Pak Grocery Corporation, we now turn to the second major issue in this case: Did the trial court err in ordering Pik-a-Pak's eviction? In answer to this question, we turn to the terms of the lease.
The sublease provided that Pik-a-Pak Grocery Corporation comply with all laws and ordinances in effect or to be enacted. It additionally provided the following crucial language:
"Should the lessee at any time violate any of the conditions of this lease, or discontinue use of the premises for the purpose for which they are rented, or fail to pay the rent, water bill, or other expenses assumed under this lease, punctually at maturity, as stipulated; or upon the adjudication of the lessee in bankruptcy the appointment of a receiver for the lessee, or the filing of a bankruptcy, receivership, or respite petition by the lessee; or upon lessee's suspension, failure or insolvency; and should such violation continue for a period of five (5) days after written notice has been given to the lessee then at the option of the lessor, the rent for the whole and unexpired term of this lease should at once become due and exigible and the lessor shall have the further option at once to demand the entire rent for the whole term or to immediately cancel this lease, or to proceed for past due installments only, reserving its right to later proceed for the remaining installments, all without putting lessee in default. Lessee to remain responsible for all damages or losses suffered by lessor, lessee hereby assenting thereto and expressly waiving the legal notices to vacate the premises. Should an Agent or Attorney be employed to give special attention to the enforcement or protection of any claim of lessor arising from this lease, lessee shall pay, as fees and compensation to such Agent or Attorney an additional sum of ten percent of the amount of such claim, the minimum fee, however, to be $25.00, or if the claim be not for money, then such sum as will constitute a reasonable fee, together with all costs, charges and expenses.
"Failure to strictly and promptly enforce these conditions shall not operate as a waiver of lessor's rights, lessor expressly reserving the right to always enforce prompt payment of rent, or to cancel this lease, regardless of any indulgences or extensions previously granted. The receiving by lessor or lessor's representative of any rent in arrears, or after notice or institution of any suit for possession or for cancellation of this lease, will not be considered as a waiver of such notice of suit, or of any of the rights of lessor." (Emphasis added.)
*860 Additionally, the lease between Cuoco and the owner of the property, the Orleans Parish Levee Board, required that Cuoco keep the property free from litter and that no debris be thrown in the New Basin Canal. This clause was not expressly included in the sublease between Cuoco and Pik-a-Pak, however, Cuoco argues that the anti-litter restriction is covered by the general language "all laws or ordinances" in Pik-a-Pak's sublease.
On July 12, 1978 as evidenced by the post office return receipt, Pik-a-Pak received a letter dated June 12, 1978 advising Pik-a-Pak that their lease was terminated due to littering. The text of that letter is as follows:
"This is to advise you that I am terminating your lease due to your continual violation of the terms of the lease by your failure to keep the premises clean of litter and debris. You have continually violated local littering laws by allowing litter to be spread all over the area surrounding the store's location as well as disregarding the terms of the lease whereby you agreed to keep the premises clean.
"This letter is to give you notice that we are terminating your lease and will take whatever action is necessary to dispossess you of the premises.
 Sincerely yours,
 Russell Cuoco"
Pik-a-Pak was not sent the contractually required five-day notice of noncompliance prior to the receipt of the letter purporting to terminate the sublease. Indeed, the only correspondence ever sent to Pik-a-Pak relative to a littering problem was before 1978 is as illustrated below.
(1) August 9, 1971, letter from D. A. McGovern to Pik-a-Pak (P-11)
(2) March 23, 1972, letter from Cuoco to Pik-a-Pak (P-12)
(3) April 29, 1976, letter from Cerise to Pik-a-Pak (P-14)
(4) June 15, 1976, letter from Cuoco to Pik-a-Pak (p-13)
In contrast to the July 12, 1978 letter purporting to terminate the sublease, the June 15, 1976 letter contained an express notification of noncompliance:
"Unless the matters complained of in the letter are not cleared up within five days from receipt of this letter, I will have no alternative but to immediately cancel this lease ... At the end of the five-day period mentioned above, an inspection will be made ..."
On all four prior occasions, the problem was immediately remedied and the sublessor continued to accept the rent. On the occasion of the alleged breach occurring on or about July 12, 1978, however, the sublessor failed to provide the five-day contractual notice of noncompliance which he had afforded the sublessor on previous occasions. The sublessor did, however, continue to accept rent for the months of July, August, September, October and November of 1978.
The sublessor contends that the letter dated June 15, 1976 constituted sufficient notices of noncompliance. We find it hard to believe that notice sent some two years prior constitutes sufficient contractual five-day notice to rectify.
The sublessor further contends that the provision of the lease quoted below relieves him of the responsibility of providing contractual notice:

"Failure to strictly and promptly enforce these conditions shall not operate as a waiver of lessor's rights, lessor expressly reserving the right to always enforce prompt payment of rent, or to cancel this lease, regardless of any indulgences or extensions previously granted." (Emphasis added)
While the provision may be used by the lessor to compel the lessee's future compliance with the lease, it cannot be used by the lessor to avoid his own obligations under the lease; the provision is the lessor's sword, not his shield. To first allow a lessor to agree to undertake highly specific and technical obligations on a clause by clause basis and then to absolve him from whatever obligation with which he chooses not to comply, would be a total abrogation of the law of contract. Contracts of lease would *861 become worthless facades under the interpretation advanced by the sublessor. We cannot allow this to happen. To do otherwise would be to allow a party to manipulate the contractual and legal time delays. The sublessor cannot evict Pik-a-Pak Grocery Corporation without first affording the sublessee with the five-day rectification period. Di Fatta v. Compagna, 157 So.2d 633 (La.App. 4th, 1963); Governor Claiborne Apartments v. Attaldo, 228 La. 381, 82 So.2d 323 (1955); Canal Realty and Improvement Co., Inc. v. Pallet, 217 La. 376, 46 So.2d 303 (1950); Arms v. Rodriguez, 232 La. 951, 95 So.2d 616 (1957); Lieux v. Dillard, 273 So.2d 880 (La.App. 4th, 1973); Four Seasons, Inc. v. New Orleans Silversmith's Inc., 223 So.2d 686 (La.App. 4th, 1969).
The disposition of this case on the above stated grounds should not be read to imply that a breach did in fact occur. The sublessor produced scant evidence that the breach due to littering occurred sometime near the July 12, 1978 letter. Plaintiff introduced some photographs which were of an uncertain date, copies of several ordinances prohibiting littering, and vague testimony indicating that on isolated occasions during the over ten years occupancy of Pik-a-Pak, some litter was evident on the premises. It should be noted that Pik-a-Pak has never been ticketed for littering by any authority charged with the enforcement of those ordinances.
For the reasons cited above, we find that defendant, Pik-a-Pak, validly executed the options extending its written lease with the plaintiff, Russell Cuoco, and that plaintiff failed to give the five-day written contractual notice of violation to the lessee required by said lease, and therefore this eviction proceeding against Pik-a-Pak cannot be maintained and must be dismissed. We also hold that General Host Corporation was not a party in the lease.
Accordingly, we reverse the judgment of the trial court and enter judgment in favor of defendant Pik-a-Pak Grocery Corporation, dismissing plaintiff Russell Cuoco at his costs.
REVERSED.
NOTES
[1] "Mr. Gilly:

I believe we stipulated or Mr. Mollere and Mr. McGovern stipulated that Pik-a-Pak Grocery Corporation validly extended the terms of the sublease by that letter for the second option.
Mr. McGovern:
Stipulated. That's in the record. That renewed the option.
Mr. Gilly:
Between Pik-a-Pak Corporation. And stipulate to that.
Mr. McGovern:
We put that in the record." (Tr. p. 206)
* * * * * *
"Mr. Gilly:
At this time, I would like to point out it's my understanding the parties have stipulated that the lease was validly extended in the provisions at the original sublease by the document he is showing Mr. Mucci. So, if we can, stipulate that both documents represents valid exercise of the options to extend the lease.
Your Honor, we stipulated to that in your office, if you will recall, after a rather heated session.
Mr. McGovern:
I'm trying to establish, I was wondering if he had any knowledge of this. Okay? Mr. Cuoco signed it. I could introduce it that way too.
Mr. Gilly:
I will stipulate to the admissibility.
Mr. McGovern:
Will you stipulate that we submit these into the record, these two?
Mr. Gilly:
Yes.
Mr. McGovern:
This is Exhibit P-47 and P-48.
Mr. Gilly:
Or joint Exhibits One and Two." (Tr. pp. 183-184)
* * * * * *
"Mr. Mollere:
Your Honor, am I under the false impression? Didn't we stipulate to that in you office, that (in) the 1962 lease both of the options were extended?
The Court:
That was my impression.
Mr. McGovern:
Yes.
The Court:
I don't think he is questioning that.
Mr. McGovern:
I'm not questioning that. I want to put in evidence this is how they were renewed and everything. I am not questioning you had possession of the letter.
The Court:
Here's a copy.
Mr. Mollere:
I don't know what purpose it serves. I have no objection to it. I want it understood we have to settle that other issue.
Mr. McGovern:
They are under the option, right.
Mr. Gilly:
I believe we may have the original signed document in here.
Mr. McGovern:
You want to stipulate to admit we both agreed to admit this? I will mark it and put it in there." (Tr. pp. 185-186)
[2] Exhibit P-48
[3] Exhibit P-49