480 So.2d 832 (1985)
SEALY (PINES ROAD) a Louisiana Partnership in Commendam, Plaintiff-Appellee,
v.
PHYSICIANS & SURGEONS HOSPITAL, INC., Defendant-Appellant.
No. 17312-CA.
Court of Appeal of Louisiana, Second Circuit.
December 4, 1985.
Rehearing Denied January 10, 1986.
Writ Denied March 7, 1986.
*833 James A. Van Hook, Sr., Shreveport, for defendant-appellant.
Wiener, Weiss, Madison & Howell by James R. Madison, Shreveport, for plaintiff-appellee.
Before MARVIN, JASPER E. JONES and FRED W. JONES, Jr., JJ.
MARVIN, Judge.
From a judgment enforcing an extended or renewed lease in favor of its lessor, Sealy, the hospital appeals, contending that it did not intend, and did not validly exercise its option, to renew the term of a written lease other than to a mere holding over or month-to-month term, and that in any event, any "lease" that extended after expiration of the primary term of the written lease was not enforceable because the rent was not certain and determinate and was not agreed to by it and Sealy.
These issues present mixed questions of law and fact and depend primarily upon dealings of the parties during and after the primary term of the written lease. Sealy answered the hospital's appeal and seeks to increase the award of attorney fees for legal services rendered on appeal. We amend and affirm.

FACTS
Effective January 1, 1980, another lessor leased to the hospital for a three-year term at a fixed rent premises in the Huntington Office Park in Shreveport. The hospital intended to staff, equip, and operate a medical clinic in the building. Sealy later purchased the building and the lease. The lease contained these pertinent provisions which we emphasize:
15. Holding Over. Any holding over by Tenant ... after the expiration of this lease shall operate and be construed as a tenancy from month to month at a monthly rental of one and one-half times the amount of the [primary term rent]. No receipt of money by Landlord from *834 Tenant or other act or omission of Landlord after the expiration of this lease shall reinstate or extend this lease or affect any prior notice given by Landlord to Tenant, and no reinstatement or extension shall be valid unless it is in writing and signed by Landlord and Tenant.

23. Entirety of Lease. It is expressly agreed ... that there are, and were, no verbal ... agreements or promises pertaining thereto not incorporated in writing herein, and it is likewise agreed that this lease shall not be ... amended or extended otherwise than as provided herein, unless it is done in writing by the proper authority.
31. Option. It is agreed that Tenant shall have the option to renew this lease for an additional term of five (5) years, with the understanding that Landlord reserves the right to increase or decrease the monthly square foot amount based on the Consumer Price Index as computed by the Department of Labor (or its successors) after date hereof, by giving Landlord written notice of its election to exercise this right at least ninety (90) days prior to the expiration of the original or any renewal term.
The hospital timely paid the monthly rent during the primary term but did not occupy the premises even though it continued attempts to implement its plan to operate a clinic. On September 8, 1982, more than 90 days before the end of the primary term, the hospital's executive director wrote to Sealy:

In accordance with the terms of our lease, please accept this letter as notification that we desire to extend our option to renew our lease for an additional term of three (3) years. (Emphasis ours.)
This letter was not an unconditional exercise of the option to renew because the lease provided that timely exercise of the option would result in a five-year renewal term. This letter is an offer to renew the written lease for an additional term of three years. CC Art. 1927.
On November 8, 1982, Sealy's property manager replied to the hospital's offer:
We have received and accepted your letter of notification that you desire to extend your lease ... for an additional term of three years. (Emphasis ours.)
As we shall show, as amplified by the further dealings and conduct of the parties, this letter was an acceptance of the hospital's offer to renew or reinstate the lease for a three-year term beginning January 1, 1983.
On December 10, 1982, and still within the primary term of the lease, Sealy's property manager wrote the hospital's executive director "confirming" the three-year renewal term and advising that the monthly rent for that term, according to the provision in the lease making the Consumer Price Index applicable to the renewal term, would be $2,013, approximately $500 more than the fixed monthly rent for the primary term.[1]
This letter was immediately presented by the hospital to its financial officer. This officer testified that he was not aware that the hospital had considered exercising the option until after he received a copy of Sealy's letter of December 10, 1982. This officer telephoned Sealy's property manager and requested that Sealy provide the formula from which the CPI increase was calculated. Sealy complied in a letter dated December 15, 1982.
After reviewing Sealy's written calculations and explanation, the hospital's financial officer, on about December 28, 1982, again telephoned Sealy's property manager. He did not object to Sealy's method of *835 calculation, but asked for some reduction in the increase of the rent for the renewal term because he considered the rent increase "rather excessive" for the unoccupied premises. Sealy's property manager said she did not have authority to negotiate rent, and suggested that the hospital should make its request in writing. She suggested that the hospital pay the increased rent for January 1983 because it was "already in the computer," and that if Sealy later granted the reduction Sealy would give credit for that payment.
The hospital paid Sealy the increased rent for the first month of the renewal term and wrote Sealy on January 3, 1983, that:
We would appreciate it if you would review the computation for the new monthly rental. As you are aware, we have been unable to recruit a physician for this space. We want to continue to lease the space but feel that the increase of over 31% may be excessive in light of the fact that the space is vacant. If possible, we would like to renegotiate a lower increase than your proposal.
Sealy responded in a letter of January 17, 1983, agreeing to reduce the rent increase by 50 percent, effective until January 1, 1984, or until the building was occupied. The hospital did not respond to Sealy's January 17 letter.
The hospital also timely paid the increased rent for February without the reduction mentioned in Sealy's January 17 letter and on February 14 wrote Sealy that it desired to terminate the lease.[2] The hospital sent a check for $586 representing the difference between the stipulated rental figure in the "holding over" clause (1½ times the primary term rental) and the $2,013 monthly rental for the renewal term calculated by Sealy using the CPI. Sealy later returned the check and demanded the $2,013 each month until this lawsuit was filed in June 1983 to enforce the lease.

OFFER AND ACCEPTANCE: EXERCISE OF THE "OPTION"
The hospital describes its September 8, 1982, letter as a request or "counteroffer" to "extend the [five-year] option" for only three years and argues that Sealy's response was not an acceptance of that offer but a mere acknowledgment of receipt of that offer pending a formal written agreement between the parties.
The hospital argues that the primary lease lapsed and became month-to-month holding over by tacit reconduction because the option to renew was not unconditionally exercised before the end of the primary term in accordance with the terms of the option. See Cappiello v. Hingle, 170 La. 295, 127 So. 729 (1930); Southern Ventures Corp. v. Texaco, Inc., 372 So.2d 1228 (La.1979); Governor Claiborne Apartments, Inc. v. Attaldo, 256 La. 218, 235 So.2d 574 (1970). The lease provides that the hospital
shall have the option to renew ... for an additional term of five (5) years ... by *836 giving Landlord written notice of its election to exercise this right at least 90 days prior to the expiration of the original or any renewal term. (emphasis ours.)
The September 8, 1982, letter is an offer from the hospital to Sealy to allow exercise of the option for three years. The only "discrepancy" between the option provisions and the hospital's letter is the length of the renewal term. The hospital strenuously contends this discrepancy renders its exercise of the option incomplete or invalid and that its correspondence with Sealy in late 1982 was, therefore, simply a preliminary negotiation that was intended to lead to the consummation of a separate, written modification or extension of the lease. The hospital emphasizes the provision that the lease "shall not be altered, waived, or extended otherwise than as provided herein unless it is done in writing by the proper authority."
The hospital's executive director testified that he did not consider the September 8 letter binding until a renewal term rent was negotiated and a new lease drawn up and signed by both parties. The trial court found, however, that the hospital intended a three-year renewal to avoid the risk of losing the space and later chose to terminate the lease when its prospects to operate the clinic worsened. We agree. See fn. two.
In short, the hospital had the option to renew the lease for five years subject to the CPI escalation clause. It chose to offer to exercise the option but for three years without inquiry about rent for the renewal term. Sealy accepted the hospital's offer on November 8, 1982, and later "confirmed" on December 10, 1982, its acceptance of the offer.
Even after Sealy wrote and explained its application of the CPI escalation clause to the hospital, the hospital did not assert that it was attempting to vary the CPI escalation applicable to the renewal term. The hospital's financial officer testified:
Q. Did you understand how the computations had been made?
A. Yes, sir.
Q. You were familiar, were you not, with how the CPI index is used to compute rental increases?
A. Yes.
Q. And you have done that yourself had you not?
A. Yes.
Q. So, you looked at the calculations and you understood the calculations and you understood what indexes had been used?
A. Yes.
Q. And you had no quarrel with the index that had been used did you?
A. No.
Q. Your only concern was that there was a lot of rent to pay for an unoccupied building?
A. As financial officer of the hospital, yes.
The fact that the hospital paid the January and February 1983 rent further supports these conclusions. Under the circumstances of this case, the rent for the renewal term ($2,013) was agreed to and was legally "certain and determinate."
After the hospital paid the January rent it verbally, and later in writing, requested that Sealy grant a reduction of the increase. Sealy agreed to reduce the increase by one-half in its letter of January 17. The hospital did not respond, but again paid the $2,013 renewal rent for February 1983.
These facts are disclosed in the letters exchanged between the parties between September 8, 1982 and January 17, 1983. If we assume arguendo that the hospital is correct that only a written agreement would extend the lease, this lease was extended by the letters written between the parties. The offer and the acceptance and confirmation were written. A lessor may accept his lessee's offer to exercise a renewal option for a term less than the renewal option provides. In any event a lease may be either verbal or written. CC Art. 2683.
*837 The hospital relies on such cases as Southern Ventures Corp., supra, to support its argument that its "request" for the three-year renewal was of no consequence. Compare Lingle v. Wainwright, 215 La. 117, 39 So.2d 843 (1949); and Huval v. 4 S Construction & Maintenance, Inc., 442 So.2d 1353 (La.App.3d Cir.1983). Southern Ventures was an eviction case where the lessee was attempting to establish that the lessor's silence implied an acceptance of the lessee's belated effort to renew a lease. Sealy's acceptance of the hospital's timely offer to renew for the three-year term is express and is in writing. Sealy is not attempting to evict the hospital, but to enforce the lease.

CERTAINTY OF THE RENT
The rent due for a lease must be certain and determinate. CC Art. 2671. Determinate has been interpreted to mean that the lease need not state an exact dollar amount if it provides a method to calculate or determine the rent, even after perfection of the lease, from factors outside the control of the parties. Mouton v. P.A.B., Inc., 450 So.2d 410 (La.App.3d Cir.1984).
Agreement to pay a "reasonable" rent has been held not effective to constitute a lease. Haughery v. Lee, 17 La.Ann. 22 (1865). Leases with rental provisions designed to vary with economic conditions, such as those based on a percentage of a sharecropper's yield or a business lessee's sales, have been often upheld. Lee v. Pearson, 143 So. 516 (La.App. 1st Cir. 1932); Arata v. Louisiana Stadium and Exposition District, 254 La. 579, 225 So.2d 362 (1969); Mouton, supra. Although the rent payable under such a lease is not "certain" until the crop is harvested or the sales figures are tallied, the rent is nevertheless found to be determinable because these results (crop yield and sales) are beyond control of the parties. Courts of other jurisdictions have scrutinized and in many circumstances upheld as "certain" rent escalation provisions based on published price indices. See Annot., Lease Provisions Providing for Rent Adjustment Based on Event or Formula Outside Control of Parties, 87 A.L.R.3d 986 (1978).
The hospital argues that the certainty requirement applies with equal force to rent owed when a renewal term option is exercised. Compare, however, Cuoco v. Pik-A-Pak Grocery Corp., 379 So.2d 856 (La.App. 4th Cir.1980), which implies that failure to specify any rent for a renewal term is not fatal to the option. Bruno v. McCabe, 71 So.2d 245 (Orl.La.App.1954) suggests that where the renewal option is silent as to rent, it may be inferred that the parties intended the provisions of the lease to apply during the renewal term.
The hospital argues that Bruno and Cuoco address options silent as to rent and that when the option provides for a different rent for the renewal term, the general rules of rent certainty should apply. The record, however, supports the trial court's finding that the renewal term rent was certain and determinate within the meaning of CC Art. 2671 because the hospital offered to exercise the option for three years and understood the CPI method of calculation used by Sealy. See North Louisiana Milk, Etc. v. Southland Corp., 352 So.2d 293 (La.App. 2d Cir.1977). See testimony of the hospital's financial officer quoted supra.
The hospital paid the increased rental without protest. Mere grumbling over a price does not affect an effective acceptance of an offer. North Louisiana Milk, Etc. v. Southland Corp., supra.
The hospital did not condition its offer to renew for three years instead of five on the condition that the renewal term rent be renegotiated and did not complain about its three-year obligation but only about the degree of the increase. The hospital was bound by the terms of the primary lease including the escalation clause especially when that clause had been explained to it before January 1, 1983. The hospital did not question its obligation during late 1982 and there is no evidence to indicate that the hospital intended before January 1, 1983, that the renewal be conditioned upon re-calculation of calculated rent. The hospital *838 merely asked for or requested some reduction in the increase when the hospital's financial officer telephoned Sealy's property manager about December 28, 1982.
On January 3, 1983, the hospital's executive director wrote Sealy's property manager
Pursuant to your conversation with Jim Hughes, Controller, on December 28, 1982, concerning the renewal of our lease for the Huntington Park Office space, we are requesting only a 3-year renewal even though the lease states a 5-year period.
We would also appreciate it if you would review the computation for the new monthly rental. As you are aware, we have been unable to recruit a physician for this space. We want to continue to lease the space but feel that the increase of over 31% may be excessive in light of the fact that the space is vacant. If possible, we would like to re-negotiate a lower increase than your proposal.
Sealy's reply of January 17, 1983, stated in part:
In answer to your letter of January 3, 1983, we have reviewed your lease agreement and we are aware of the position you are in at the present time. We would be willing to renew your lease for a period of three (3) years beginning January 1, 1983 and ending December 31, 1985, based on the following:
Effective January 1, 1983 your rent will increase by 16% which is ½ of the adjusted CPI increase as stated in your lease agreement or $1,784.08. Your rent will remain at this rate until actual occupancy of the space or January 1, 1984, which ever occurs first. Upon occupancy or beginning January 1, 1984, your rent would then be increased to the CPI of 31.06% for the remainder of your lease term ...
Rent from January 1, 1983 until occupancy or beginning January 1, 1984, whichever occurs first, will be $1,784.08 per month.
Notwithstanding that Sealy's reply is inartfully worded in future tense and in terms of an "offer" to reduce the increase, it is nonetheless a written agreement or acceptance of the hospital request that the increase be reduced.[3] We shall enforce the renewed lease as agreed but shall amend to allow the hospital the benefit of the concession later granted by Sealy. CCP Art. 2164.

ATTORNEY FEES FOR APPEAL
The judgment awarded Sealy $2,000 under a provision of the lease requiring the lessee to pay reasonable attorney fees for enforcement of the lease. Because the lease provides for attorney fees and because Sealy timely asserted its demand by answering the appeal, we amend to increase the award to Sealy by $500 for attorney fees for services rendered in connection with this appeal.

DECREE
For the foregoing reasons, the judgment is amended to reflect a reduction in the monthly rent payable during 1983 to $1,784.08. The rent owed during 1984 and 1985 was $2,013.70 per month. We amend to reduce the award to $65,710.36 and to increase the attorney fee to $2,500. At appellant's cost, the judgment, as amended, is AFFIRMED.
NOTES
[1] The letter states:

This letter shall serve as confirmation of [the] hospital's option to renew their lease ... for a period of three years beginning January 1, 1983 and ending December 31, 1985.
The rent on this space, which contains 2,396 sq. ft. of useable or 2,684 sq. ft. of rentable area, has been adjusted to reflect the increase in the Consumer Price Index. The monthly rental for the option period shall be $2,013.65. All other terms and conditions shall remain in full force and effect.
[2] The trial court found that the hospital's attempt to terminate the lease was prompted by this February 10, 1983, memo from the hospital's executive director:

For some time now P & S Hospital has been leasing space in an office building in Huntington Park. We had planned to recruit one or two family practitioners for the space in this supposed "medically underserved" area of Shreveport.
Very recently I have come across some rather disturbing information that sheds a new light on this project. Doctors Hospital, several months ago, relocated two general internists to this area. After five months of practice each internist is seeing fewer than two patients/day in their office. This information has been confirmed by several sources. Also, a ... (family practitioner) from another hospital opened a satellite office seven weeks ago in the south central Shreveport area. He is now averaging less than one patient/day and admitted to me that he feels he made a big mistake. If he doesn't materially pick up within the next three months he plans to "shut her down".
In light of these recent developments I am proposing that we immediately initiate action to terminate our lease. Also, until we have the opportunity to further investigate the bona fide need for one or more family practitioners in this area, we are recommending that we cease recruiting efforts for this area.
[3] The last paragraph of the letter states:

All other terms and conditions of your lease shall remain in full force and effect. Please indicate your acceptance by signing on the line provided below and return both copies to our office for execution.
Sealy's property manager explained that this language is routinely and customarily used on all correspondence sent by Sealy to its tenants.