974 So.2d 198 (2008)
Donald L. LAMBERT, Plaintiff-Appellant
v.
DON M. BARRON CONTRACTOR, INC., Defendant-Appellee.
No. 42,868-CA.
Court of Appeal of Louisiana, Second Circuit.
January 9, 2008.
*199 Booth & Booth, APLC, by. Jane Ettinger Booth, New Orleans, for Appellant.
Harold W. Aswell, Farmerville, for Appellee.
Before CARAWAY, PEATROSS and DREW, JJ.
CARAWAY, J.
This dispute concerns the formation of a contract between two admitted good friends. Because of the troubled construction business of the defendant, the plaintiff allegedly entered an oral one-year consultant agreement with the defendant for $37,200. After reviewing the parties' dealings and relationship, the trial court determined that the defendant never accepted the offered services of the plaintiff, and in the absence of a clear meeting of the minds of the parties, plaintiffs contract claim was dismissed. Reviewing the trial court's factual findings under the manifest error standard, we affirm the ruling.

Facts
Don M. Barron ("Barron") is a commercial construction contractor doing business in Farmerville, Louisiana. His corporation is Don M. Barron, Inc. ("DMB, Inc."). This dispute arises out of an alleged consulting contract entered between Barron and Donald G. Lambert ("Lambert") in 1998, when Barron's business experienced financial difficulties.
Earlier, in 1996, DMB, Inc. contracted with an out-of-state developer for several apartment construction projects in Ohio and Georgia. DMB, Inc. provided its bonding capacity in exchange for a percentage of the returns on the projects. The total construction cost of each project ranged from two to fifteen million dollars. DMB, Inc. received payments and deducted its percentage as work progressed on the project. As they neared completion in 1998, problems with subcontractor performance, suppliers and other disputes arose, leaving DMB, Inc. with substantial difficulties stemming from its relationship with the developer. DMB, Inc. began experiencing financial strain as the projects became mired. DMB, Inc.'s attorney was actively engaged in resolving disputes on all five projects.
Barron and Lambert had a long-standing professional relationship based on their public service together on the Louisiana State Board of Licensed Contractors from the 1980's. Lambert remains a member of that state board. They described themselves as mutual good friends. Lambert had been chairman of the state board, and established his experience in resolving construction disputes, particularly when handling arbitration mandated under standard form construction agreements. Barron and Lambert talked by phone during the summer of 1998 about Barron's personal problems and financial difficulties. The *200 financial matters stemmed from the misallocation of construction funds for the five troubled projects for which DMB, Inc. was ultimately held to account. At trial, Lambert acknowledged his concerns in 1998 for his friend's depressed mental state.
On November 11, 1998, Lambert boarded a plane owned by DMB, Inc. and flew from New Orleans to Farmerville to meet with Barron and his employee, Bobby Bennett ("Bennett"). Lambert contends that before he boarded the plane for the return trip home that day, he and Barron contracted for consulting services on the airport runway. Lambert advised Barron at the airport that he customarily charged his clients $3,100 per month, and the minimum term for his services was one year. He also charged 10% of any amount recouped by his clients in settlement.
Prior to the November 11 meeting, on November 3, Bennett had faxed and overnighted copies of various construction contracts and correspondence with DMB, Inc.'s attorney for Lambert's review. In particular, Lambert testified he assisted DMB, Inc. in the arbitrator selection process prescribed under the model form agreements. An arbitrator from New Orleans whom Lambert knew was ultimately slated for one of the troubled project's arbitration; however Lambert admitted that this hearing never occurred. Barron testified that no settlement funds were recovered on any of the five projects.
While admitting that Lambert had reviewed documentation on the five projects, Barron testified that he never received any more monies generated from the distressed projects. After receiving a 53,100 invoice from Lambert, Barron made one payment in December 1999, thinking it covered Lambert's initial review of the documentation and the day trip to Farmerville in November 1998.
Lambert presented into evidence copies of invoices sent to Barron in late 2000 for a $34,100 balance owed on the alleged oral contract. Lambert's letter dated October 30, 2000, requested payment and stated, "I have preformed (sic) my service for you and I must request that you pay me the balance due me of $34,100." Two weeks later, Barron wrote Lambert back:
I received your bill last week and was very shocked. I do not know where you are coming from, and What you have done to think you deserve any kind of pay.
I sent the plane down for you to come up and look over some paper work and later we sent you some documents for you to take a look at. For your service for a full day and the one to three hours it may have taken, I was planning to pay you $2,000.00 and thought that would be around $150.00 an hour. My people knew you had been here so they paid the $3,100.00 invoice you sent.
Then awhile later you called about money and I told you that we had paid you plenty and would not pay you any more. I remember you showing me a long list of people that paid you $3,100.00 a month. I did not tell you I wanted to be on that list. I have not called for any advice since then. All my calls have been to return your call.
On August 15, 2001, Lambert filed a petition for 834,100 owing under a contract for services, plus 10% of any settlement amount regarding disputes on which, he had provided consulting services. In the bench trial, Barron, Lambert and Bennett testified regarding the parties' dealings and the issue of the existence of a contract. The trial court took the matter under advisement and, after a lengthy opinion, dismissed plaintiffs suit. It is from this judgment that Lambert appeals.

*201 Discussion

This case involves the disputed formation of a contract for consulting services. A contract is an agreement by the parties whereby obligations are created. La. C.C. art. 1906. A contract is bilateral when the parties obligate themselves reciprocally, so that the obligation of each party is correlative to the obligation of the other. La. C.C. art. 1908.
The parties' consent to the alleged contract, or their meeting of the minds through an offer and acceptance, was the focus of the trial court's ruling. "Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent." La. C.C. art. 1927.
The trial court's ruling credited Barron's testimony that he never orally accepted Lambert's offer for consulting services under the proposed one-year arrangement with $3,100 per month payments. There was no writing reflecting the parties' consent. Nevertheless, the trial court's task was also to review Barron's alleged acceptance of the agreement from the implications of his actions or inaction. In this regard, Civil Code Article 1942 provides:
When, because of special circumstances, the offeree's silence leads the offeror reasonably to believe that a contract has been formed, the offer is deemed accepted.
An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless the finding is clearly wrong. Lewis v. State Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Chaisson v. Chaisson, 29,243 (La.App. 2d Cir.2/26/97), 690 So.2d 899. The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Lewis v. State. Through Dept. of Transp. and Development, supra; Stobart v. State through Dept. of Transp. and Development, supra; Lebeaux v. Newman Ford, Inc., 28,609 (La.App. 2d Cir.9/25/96), 680 So.2d 1291.
This case involves the special setting of parties with a prior friendship and the aid and advice freely given between friends that existed before Lambert first broached the subject of a consulting contract. In Chaisson, supra, this court found in a similar setting that an oral loan agreement had been reached between parents and their son. The son admittedly had understood his parents' intent for a loan for college expenses, but denied his acceptance of the loan agreement. Nevertheless, the son's actions in receiving the benefits of the loan proceeds in that setting and his subsequent partial payments on the loan were enough for this court to affirm the lower court's factual determination of a binding contract. See also, North Louisiana Milk Producers Assn, Inc. v. Southland Corp., 352 So.2d 293 (La.App. 2d Cir.1977), writ denied, 354 So.2d 200 (La.1978). A family setting' or close friendship requires the finder-of-fact' to determine the offeree's acceptance of an onerous contract and the offeror's reasonable belief that a contract has been formed, thus overcoming the competing implications of a benefit extended by one to a friend for a gratuitous reason without obtaining any advantage in return. See La. C.C. arts. 1967, 1909 and 1910.
From our review of the testimony of the two men, we also conclude that there was no clear agreement given by Barron on November 11, 1998, as Lambert boarded *202 the plane to return to. New Orleans. While stating that Barron expressed no "problem" with a consulting fee arrangement, Lambert's testimony was that two or three days later, Bennett expressly confirmed in a phone conversation Barron's acceptance of the proposed consulting arrangement. To the contrary, Bennett denied having any authority to engage a consultant, telephone contact with Lambert over consulting matters, and knowledge of any consulting agreement with Lambert.
Absent a direct oral or written accepetance by Barron, Lambert's proof of the contract rests on his receipt of certain documentation of Barron's troubled construction projects and invoices for consulting fees sent to Barron. The bulk of the documentation regarding Barron's five construction projects was forwarded to Lambert days before the Farmerville meeting. Lambert's review of the details of those construction contracts and Barron's problems with the projects would have been performed in preparation for the Farmerville meeting without any contract binding his friend. More importantly, Barron provided Lambert that documentation without any indication that his friend's review of the projects would require compensation.
After Lambert expressed at the Farmerville airport his offer and desire for a consulting contract, some further documentation was provided to him between April and August 1999. These were transmitted by fax to Lambert without any request for specific services. The faxed documents primarily concerned correspondence from Barron's attorney to Barron reflecting the scheduling of mediation and arbitration hearings. Significantly, Barron's attorney never consulted Lambert, and Lambert never responded in writing to Barron regarding any substance concerning the status of the construction project disputes during that time. Moreover, Barron never used the principal subject matter of Lambert's expertise, arbitration, to resolve disputed construction project issues during the year following the, alleged oral contract, the only scheduled arbitration having been postponed indefinitely.
The only invoices concerning the alleged contract presented into evidence by Lambert were lump sum invoices dated in October and November of 2000 for $34,100. Copies of any prior monthly invoices for S3,100 were not filed in the plaintiff's case. Barron's testimony identified payment of an initial invoice for $3,100 in December 1999. Lambert's testimony confirmed that he did not expect Barron to make monthly payments after the initiation of the alleged consulting agreement in November 1998 because of Barron's weak financial position. Therefore, the record does not establish when, if ever, regular monthly invoices of $3,100 might have been received by Barron.
From our review of this evidence, we find that the trial court could determine that no tacit acceptance of Lambert's offer for services was made by Barron. Particularly lacking from the record is evidence of any substantive business benefit realized by Barron from his consultant friend. The trial court ultimately held that the parties' relationship was that of a "friend helping a friend," such that Lambert could not have reasonably believed that a contract had been formed. Accordingly, there is no manifest error in the trial court's ruling.

Conclusion
For the reasons expressed above, the trial court's determination that no contract was formed between the parties is affirmed. *203 Costs of the appeal are assessed to appellant.
AFFIRMED.